IN RE INTEREST OF MELEY P., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE, V.
MARIO P., APPELLANT, AND ERIKA R., APPELLEE
AND CROSS-APPELLANT.
689 N.W.2d 875

Filed December 14, 2004.    No. A-04-301.

Joseph Lopez Wilson for appellant.

Stuart J. Dornan, Douglas County Attorney, and Matthew R. Kahler for appellee State of Nebraska.

Thomas C. Riley, Douglas County Public Defender, and Timothy F. Shanahan for appellee Erika R.

INBODY, Chief Judge, and IRWIN and CARLSON, Judges.

INBODY, Chief Judge.

INTRODUCTION

The instant case involves an order of detention regarding Meley P., infant daughter of Mario P. and Erika R. Mario has appealed, and Erika has cross-appealed, a provision of the order of the Douglas County Separate Juvenile Court prohibiting contact between Mario and Erika.

STATEMENT OF FACTS

On January 30, 2004, Mario and Erika became the parents of a daughter, Meley. On February 5, a petition was filed in the

Douglas County Separate Juvenile Court alleging that Meley was a minor child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002) because she lacked proper parental care by her natural parents in that Mario and Erika had engaged in domestic violence, that Mario struck Erika while she was pregnant with Meley, and that Meley is at risk of harm. On that same date, the juvenile court granted a motion filed by the State for temporary custody and placed custody of Meley with the Nebraska Department of Health and Human Services (DHHS).

A temporary detention hearing was held on February 13, 2004. During this hearing, the State elicited testimony from Shirley King, a DHHS caseworker in the Child Protective Services division. King testified that she was assigned to investigate allegations of domestic violence between Erika, who was 17 years old, and Mario, who was 19 years old. King testified that in November 2003, Mario assaulted then-pregnant Erika, and that as a result, he was convicted of assault and incarcerated until the day before Meley was born. King also testified that the November 2003 assault was not an isolated incident and that Erika had for a time been forced to stay at Mario's home against her will. According to King, although Mario had identified himself as Meley's biological father at the hospital, he was not allowed to sign the birth certificate because he did not have his identification on his person.

King testified that on February 6 or 7, 2004, she met with Mario and Erika. At the time of this meeting, Erika was residing in Mario's home. When asked at the meeting about the November 2003 incident of domestic abuse, Erika stated that Mario had "changed" and that "he wouldn't do it anymore because he was afraid of going to jail again." At trial, King characterized such statements as "minimizing behavior" and testified that minimization on the part of an individual involved in an abusive relationship is typical. According to King, Erika had also indicated during the meeting that in the past, Mario had threatened her parents. King stated that she had received information from Erika's father that these threats were to "shoot" Erika's father and to "shoot up" her parents' car and home. One or two days after the meeting with King, Erika informed King that Erika was residing at her parents' home and that Erika was unsure of the status of her relationship with Mario.

King testified that during her interview of Mario at the same meeting, he admitted to grabbing Erika by her arm while at Erika's parents' home, that he did not want Erika residing with her parents, and that although Erika initially chose to reside with him willingly, he eventually kept her at his home against her wishes. King testified that during another conversation with Mario which took place a few days prior to the detention hearing, Mario admitted pushing Erika such that she fell " 'on her booty' up the stairs" on an occasion other than the November 2003 incident.

King testified that Meley would be at risk of harm if placed in either Erika's or Mario's custody. Specifically, King stated that Meley was at high risk due to the documented history of physical violence between Mario and Erika, as well as the probability that if Meley were to be placed with Erika, Erika would likely take her to stay with Mario, creating further risk of abuse or shaken baby syndrome. King also testified regarding additional safety concerns including other reports of domestic violence between Mario and Erika and the possibility that Meley was born 3 to 4 weeks prematurely due to stress and physical abuse by Mario.

The only other evidence was testimony by Mario. Mario testified that he had been in a relationship with Erika for approximately 1½ years and that he is Meley's father. He admitted to being convicted of the November 2003 assault against Erika and incarcerated for 2½ months. According to Mario, the assault took place at Erika's parents' home when he refused to leave after being requested to do so. Mario testified that he grabbed Erika by the arm, pushed her into a wall, and then grabbed her by the neck. Mario also admitted to having told King about a prior incident where he pushed Erika down a flight of stairs.

On February 27, 2004, the juvenile court filed an order continuing temporary custody of Meley with DHHS, granting Erika supervised visitation, and denying Mario visitation pending paternity testing. Additionally, the court ordered that Mario and Erika **"shall have no contact with one another** and shall not display any type of aggressive behaviors and/or conduct and that any communication as it may relate to the health or safety of [Meley] shall occur through their attorneys." (Emphasis in original.) Mario has timely appealed to this court, and Erika has cross-appealed.

## ASSIGNMENT OF ERROR

Mario's appeal and Erika's cross-appeal raise the same alleged error: The juvenile court erred in prohibiting contact between Mario and Erika.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Jac'Quez N.*, 266 Neb. 782, 669 N.W.2d 429 (2003); *In re Interest of Joshua R. et al.*, 265 Neb. 374, 657 N.W.2d 209 (2003). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

The sole issue presented in this appeal and cross-appeal is whether the juvenile court erred in prohibiting contact between Mario and Erika. We consider whether the juvenile court had jurisdiction over Mario and Erika to enter the order prohibiting contact between Mario and Erika.

Section 43-247 provides, in part, that the juvenile court in each county as herein provided shall have jurisdiction of

(1) [a]ny juvenile who has committed an act other than a traffic offense which would constitute a misdemeanor or an infraction under the laws of this state, or violation of a city or village ordinance;

(2) Any juvenile who has committed an act which would constitute a felony under the laws of this state;

(3) Any juvenile (a) who is homeless or destitute, or without proper support through no fault of his or her parent, guardian, or custodian; who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; whose parent, guardian, or custodian is unable to provide or neglects or refuses to provide special care made necessary by the mental condition of the juvenile;

or who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile, (b) who, by reason of being wayward or habitually disobedient, is uncontrolled by his or her parent, guardian, or custodian; who deports himself or herself so as to injure or endanger seriously the morals or health of himself, herself, or others; or who is habitually truant from home or school, or (c) who is mentally ill and dangerous as defined in section 83-1009;

(4) Any juvenile who has committed an act which would constitute a traffic offense as defined in section 43-245.

Section 43-247(5) states that the juvenile court has jurisdiction over "[t]he parent, guardian, or custodian who has custody of any juvenile described in this section."

■ In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning. *In re Interest of J.K.*, 265 Neb. 253, 656 N.W.2d 253 (2003); *In re Interest of Valentin V.*, 12 Neb. App. 390, 674 N.W.2d 793 (2004).

■ The plain language of § 43-247(5) grants the juvenile court jurisdiction over parents, guardians, or custodians who have custody of any juvenile described in the section. If the pleadings and evidence at the adjudication hearing do not justify a juvenile court's acquiring jurisdiction of a child, then the juvenile court has no jurisdiction. See *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992). See, also, *In re Interest of N.M. and J.M.*, 240 Neb. 690, 484 N.W.2d 77 (1992). The statute does not grant the juvenile court jurisdiction over the parent, guardian, or custodian of a juvenile who has been *alleged* to be within the ambit of § 43-247. Thus, the juvenile court does not obtain jurisdiction over a juvenile's parent, guardian, or custodian until a finding of adjudication. See, *In re Interest of J.T.B. and H.J.T.*, 245 Neb. 624, 514 N.W.2d 635 (1994) (juvenile court acquired jurisdiction over minor children and their mother upon finding at adjudication hearing that said children were within meaning of § 43-247(3)(a)); *In re Interest of Rebekah T. et al.*, 11 Neb. App. 507, 654 N.W.2d 744 (2002) (when juvenile court adjudicates minor as abused or neglected under § 43-247, it also obtains exclusive jurisdiction over parent, guardian, or custodian who has custody of that juvenile).

The State has alleged that Meley is a child as described in § 43-247(3)(a) in that she lacks proper parental care by Mario and Erika; however, there has not yet been a finding of adjudication that Meley falls within the meaning of § 43-247(3)(a) as alleged by the petition. Thus, the juvenile court lacked jurisdiction over Mario and Erika, and the provision prohibiting contact between Mario and Erika must be reversed.

We further note that although the juvenile court does not technically acquire jurisdiction over a juvenile until a determination of adjudication, it is undisputed that the juvenile court has the authority to "take any action for preadjudication placement or detention prescribed in the Nebraska Juvenile Code." Neb. Rev. Stat. § 43-251(1) (Reissue 1998).

## CONCLUSION

Having determined that the juvenile court erred in entering the no-contact provision in the temporary order, we reverse that portion of the order. The remainder of the order has not been appealed and, thus, is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED.